SEALED
BY COURT ORDER



FILED

FEB 05 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LINDA MORALES, et al.,

Plaintiffs,

v.

COUNTY OF MENDOCINO, et al.,

Defendants.

Case No. 16-cv-02429-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Docket No. 76

## I.  INTRODUCTION

This case stems from a county's investigation of child-abuse allegations in 2015.  The investigation resulted in the removal of K.B. (the minor in question) from the custody of his grandmother Linda Morales.  K.B. was returned to Ms. Morales' care after approximately two months.  Ms. Morales, her husband Rudolfo Morales, and K.B. ("Plaintiffs") brought suit against the County of Mendocino, various County employees, and K.B.'s mother Buffey Wright ("Defendants").  Now before the Court is Defendants' Motion for Summary Judgment.

## II.  FACTUAL BACKGROUND

The general timeline of events is undisputed and is as follows:

Linda Morales is married to Rudolfo Morales.  They have at least two children, Buffey Wright ("Wright") and Rodney Wright.  Wright is the mother of K.B., the minor in question.  Rodney Wright has a child named V.W.  In 2015, Ms. Morales had custody of K.B., and Wright had limited visitation rights.  V.W. lived with Wright.

On July 22, 2015, V.W. called Mendocino County Child Protective Services ("CPS") to complain that Ms. Morales had been abusing K.B.  *See* Docket No. 86 ("Warrant Materials"), at KB_JV_0004; Docket No. 77-3, at ECF 72.  Now-dismissed defendant Jennifer Sookne, a county employee, answered the phone and completed the initial forms.  Defendant Jannee Dale, a social worker, handled the complaint.

United States District Court
For the Northern District of California

1       Dale sought and obtained a "see and speak" warrant from the Superior Court permitting

2   her to enter the Morales residence and interview K.B. *See id.* Dale, accompanied by law

3   enforcement officer Christian Denton and a tribal representative, arrived at the Morales residence

4   on July 30, where they met Ms. Morales. Shortly thereafter, Dale and K.B. exited the home to

5   speak alone, during which K.B. described some physical abuse. *See* Docket No. 79 ("Powell

6   Decl."), Ex. A ("Dale Dep."), at 90-91. At some point during this conversation, K.B. produced a

7   diary documenting abusive behavior by Ms. Morales. Dale then called now-dismissed defendant

8   Lisa Allison, also a social worker, to discuss the situation and possible options. *See* Dale Dep. at

9   82-84. Thereafter, Dale re-entered the home and sought Ms. Morales' agreement to a Safety Plan[1]

10  whereby K.B. would stay elsewhere while the investigation was pending. *See* Powell Decl., Ex. C

11  ("Removal Tr."). Denton offered to take in K.B., and Ms. Morales agreed. *See id.*

12      On August 4, Denton delivered K.B. to the CPS offices. On that day, Dale sought and

13  obtained Ms. Morales' agreement to a Voluntary Placement, which placed K.B. in foster care. *See*

14  Docket No. 81 ("Morales Decl.").

15      Approximately two months later, K.B. was returned to Ms. Morales' custody. Sometime

16  during this loss of custody, Ms. Wright petitioned to terminate Ms. Morales' guardianship of K.B.

17  The petition was later withdrawn. Also during this two-month period, K.B. was seen by a

18  physician twice for unspecified reasons. *See* Powell Decl., Ex. H ("Morales Dep."), at 78.

19      A separate complaint had been filed a year earlier in 2014, claiming that K.B. had recently

20  been beaten so badly by Ms. Morales that he could not sit down. Docket No. 77-3, at ECF 63.

21  Dale had interviewed K.B. at school on September 11, 2014. The precise content of the

22  conversation is disputed, but the parties do not dispute that K.B. did not confirm the allegations.

23  *See* Docket No. 78 ("Opp."), at 2; Docket No. 91 ("Reply"), at 1 (offering only evidence that

24  Linda Morales had struck K.B. with a belt in 2013, with no indication of the severity). Dale

25  interviewed Ms. Morales on the same day, and they signed a Risk Reduction Plan whereby Ms.

26  Morales agreed to a "hands off approach to discipline." Docket No. 77-2, at ECF 8-10. The

27

28  [1] Plaintiffs refer to this as a Risk Reduction Plan.

investigation was closed as inconclusive.  *See* Docket No. 77-3, at ECF 64.

### III.    THIS LITIGATION

The Complaint filed by Ms. Morales, Mr. Morales, and K.B. asserts 11 claims against 9 named defendants, 10 Doe defendants, and the County of Mendocino ("County").  *See* Docket No. 1 ("Compl.").  Plaintiffs voluntarily dismissed 3 named defendants and 4 claims with prejudice.  *See* Opp. at 1.  The Court previously dismissed V.W.  *See* Docket No. 74.

The remaining defendants are: social worker Jannee Dale, fellow Child Protective Services employees Lisa Allison and Mimi Cabral, Buffey Wright, and the County of Mendocino.

The remaining claims are:

- Claim 1, a § 1983 claim against the County and Dale for violation of the Fourteenth Amendment right to familial association.  The alleged factual basis for the claim is Dale's unlawful removal of K.B. from Ms. Morales' custody (under both the Safety Plan and Voluntary Placement Agreement).

- Claim 2, a § 1983 claim against the County and Dale for violation of the Fourth Amendment.  The claim has two components: (1) the unlawful seizure of K.B. by removing him from Ms. Morales' custody (pursuant to the Safety Plan and Voluntary Placement Agreement), and (2) the unlawful entry by Dale into the Morales residence on July 30, 2015.

- Claim 3, a § 1983 claim against the County, Dale, Allison, and Cabral for violation of the Fourteenth Amendment for the continued detention of K.B. despite Ms. Morales' requests for his return three times in August 2015 and once in September 2015.

- Claim 4, a § 1983 claim against Dale for violation of the First Amendment.  The alleged factual basis for the claim is that Dale prevented the Plaintiffs from speaking to each other when Dale seized K.B. on July 30, 2015.

- Claim 5, a § 1983 claim against the County and Dale for violation of the Fourteenth Amendment.  The alleged factual basis for the claim is that Dale lied to Ms. Morales that she had a warrant permitting Dale to speak to K.B. alone and, as a result, Dale was able to unlawfully interrogate K.B. on July 30, 2015.

- Claim 6, a § 1983 claim against the County, Dale, and Doe defendants for violation of the Fourteenth Amendment by subjecting K.B. to a mental health evaluation and giving him prescription medication without the Morales' presence or consent.

- Claim 8, a state-law claim against Wright for conspiring to intentionally inflict emotional distress.  The alleged factual basis for the claim is that Wright conspired to remove K.B. from the custody of Ms. Morales.

3

1

2 **IV.    THE § 1983 CLAIMS**

3 A.    Legal Standards

4 1.    Summary Judgment

5    Defendants move for summary judgment. A motion for summary judgment shall be

6 granted where "the movant shows that there is no genuine dispute as to any material fact and the

7 movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is

8 genuine only where there is sufficient evidence to find for the nonmoving party. *See Anderson v.*

9 *Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 252 (1986) ("The mere existence of a scintilla of

10 evidence . . . will be insufficient . . . ."). At the summary judgment stage, evidence is viewed in

11 the light most favorable to the nonmoving party and all justifiable inferences are drawn in his or

12 her favor. *See id.* at 255. The moving party bears the initial burden of identifying those portions

13 of the record which demonstrate the absence of a genuine dispute of material fact. The burden

14 then shifts to the nonmoving party to present evidence demonstrating that a genuine dispute of

15 material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

16 2.    Qualified Immunity

17    Key to many § 1983 cases is the doctrine of qualified immunity. Where it applies,

18 qualified immunity shields individual government officials from civil liability. To overcome

19 qualified immunity, the plaintiff must establish that: "(1) the official violated a constitutional

20 right; and (2) that right was 'clearly established' at the time of the challenged conduct such that

21 'every reasonable official' would have understood that what he is doing violates that right."

22 *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

23 (2011)). While the second prong "'do[es] not require a case directly on point . . . existing

24 precedent must have placed the statutory or constitutional question *beyond debate*,' such that

25 'every' reasonable official—not just 'a' reasonable official—would have understood that he was

26 violating a clearly established right." *Id.* at 823 (alteration in original) (quoting *Ashcroft*, 563 U.S.

27 at 741). To determine whether a legal question is beyond debate, a court looks for "'cases of

28 controlling authority in [the plaintiff's] jurisdiction at the time' or 'a consensus of cases of

4

*United States District Court*
*For the Northern District of California*

**United States District Court**
For the Northern District of California

persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Id.* "[B]arring an 'obvious case' . . . the 'clearly established' analysis . . . requires the court to '*identify a case* where an officer acting under similar circumstances'" was held to have acted unlawfully. *Id.* (citations omitted) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)); *see also Kramer v. Cullinan*, ___ F.3d ___, 2018 WL 265106, at *6 (9th Cir. Jan. 3, 2018).

B.     Removal of K.B. (Claim 1 for unlawful removal; Claim 2 for unlawful seizure; Claim 3 for
       continued detention)

       The primary contention in this case is that Dale violated Ms. Morales' and K.B.'s constitutional rights when she removed K.B. from Ms. Morales' home for approximately two months. This contention is the basis for Plaintiffs' Claim 1 for unlawful removal under the Fourteenth Amendment, Claim 2 for unlawful seizure under the Fourth Amendment, and Claim 3 for unlawful continued detention under the Fourteenth Amendment.

       *1.*     Authority to Remove Under *Wallis v. Spencer*

       The Fourteenth Amendment protects parents' and children's "right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1137 (9th Cir. 1999). Separation of parents—or here, a guardian—and children therefore requires due process, such as a hearing. *See id.* However, a social worker or other government official may warrantlessly intrude on a parent or guardian's custody of a child if, at the time of the removal, the social worker has "reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Wallis*, 202 F.3d at 1138. The danger must be so imminent that it is likely to be inflicted upon the child "in the time that would be required to obtain a warrant." *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1293 (9th Cir. 2007). "The Fourth Amendment also protects children from removal from their homes absent such a showing." *Id.* Absent a warrant, the defendant has the burden of proving her action was constitutional. *See United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012) ("[T]he government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement.").

       The question under *Wallis* therefore is whether Dale has proven she had reasonable cause

to believe that K.B. was in imminent danger of serious bodily injury such that she would not have had time to obtain a warrant.  For both the initial removal under the Safety Plan and the continued removal under the Voluntary Placement Agreement, Dale lacked reasonable cause.

a.    Safety Plan Removal

Defendants conceded the point regarding the Safety Plan.  At the hearing on this motion, the Court asked defense counsel, "Are you agreeing that at that moment, after her [Dale] going out, interfacing with KB, looking at his diary, looking at what was alleged, that there was not, at that point, reasonable cause to believe the child was in imminent danger of serious bodily injury?" Docket No. 96 ("Hearing Tr."), at 6:5-15.  Defense counsel responded in the affirmative: "Correct. . . . Ms. Dale testified to that.  She understood that.  She did not have a basis to remove him without a warrant."  *Id.*; *see also* Dale Dep. at 131-32 ("[B]ased on just that part of the investigation, there would not have been enough to take the child in the county's custody. . . . I would have had to do a petition and continue the investigation further including interviews . . . .").

This concession is consistent with the evidence.  At the point of the initial removal from the home, Dale had only gathered the referral report, interviewed K.B., and obtained the diary. The referral report did not suggest imminent danger.  The report alleges that:

> [K.B.] is hit if he does anything his grandmother does not think is right.  He is hit on his face, chest and butt—whipped with a belt, gets called fat and his food intake is very limited.  She hits him in the face with an open hand and sometimes fist; she pushes him around with a fist.  Before he could eat, he had to run and do a lot of exercises.  Grandmother made [K.B.] write a full page of lies for the court and threatened to "beat the shit" out of him.  She said she would buy him a PS3 if he did it.  The court date was recent.  She used to beat his brothers with brooms and metal hangers.  The other day [K.B.] would not kill a spider because he was afraid of it and she hit him with a hanger.

Warrant Materials at KB_JV_0004.  While serious, these allegations do not suggest serious bodily harm was imminent, especially in light of the information Dale learned in interviewing K.B.

In the interview, K.B. had admitted to Dale that Ms. Morales would sometimes slap the back of his head or punch or push him with her fist.  Dale Dep. at 91.  He also admitted that he had been spanked with a belt sometime since 2014 "but it had been a while since the last time." *Id.* Dale did not ask about the recency or frequency of these actions, but she observed no signs of

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    abuse. *See id.* at 90-91. In other words, while there may have been some risk of injury over some

2    period of time, there was no indication that K.B. was likely to be abused within the time it would

3    have taken Dale to obtain a warrant. *Cf. Mabe v. San Bernardino Cty., Dep't of Public Social*

4    *Servs.*, 237 F.3d 1101, 1108 (9th Cir. 2001) (concluding that alleged sexual abuse was not

5    imminent, where the abuse occurred only at night and there was therefore time to obtain a

6    warrant).

7        The diary is even less availing. It states in part that Ms. Morales "said she would kick my

8    ass if I" "deleted her show" and "she really puts on the mental abuse maybe just a little worse than

9    the physical and verbal abuse." Docket No. 77-2, Ex. B. These nonspecific allegations, while

10   concerning, fail to establish an imminent risk of serious bodily injury.

11       The issuance of the see-and-speak warrant was not sufficient to establish reasonable cause

12   of imminent serious bodily injury. The warrant only determined that "[e]ntry . . . is required

13   pursuant to Welfare and Institutions Code §328 in order for investigators to see and speak with the

14   child, to inspect the safety of the home, to determine whether child welfare services should be

15   offered to the family, and to determine whether juvenile court proceedings should be

16   commenced." Warrant Materials at KB_JV_0008. The issuing court left unchecked the box for

17   "Protective Custody," thereby declining to determine that "[t]he child(ren) should be placed into

18   protective custody because continuance in the parent's or legal guardian's home is contrary to the

19   child's welfare and: . . . (2) [empty checkbox] The child(ren) is/are in imminent danger of physical

20   or sexual abuse and there are no reasonable means by which the child(ren) can be protected

21   without temporary removal f[ro]m the physical custody of the parents or guardians." *Id.* at

22   KB_JV_0007-08. The warrant, therefore, was not based on a judicial finding of imminent danger

23   and did not authorize K.B.'s removal from the home.

24       Though the issuing court also found "reasonable cause to believe that the child(ren) is/are,

25   or appear to come, within the description of Welfare and Institutions Code §300," that is

26   insufficient to satisfy reasonable cause under *Wallis*. Warrant Materials at KB_JV_0007.

27   California Welfare and Institutions Code § 300 provides that a child falling within any of ten

28   categories "is within the jurisdiction of the juvenile court which may adjudge that person to be a

United States District Court
For the Northern District of California

1    dependent child of the court."  None of those categories require a finding of imminent danger of

2    serious bodily injury.

3        Given the above, Dale did not have reasonable cause for her initial removal of K.B. under

4    the Safety Plan.

5        Defendants argue that the Safety Plan was not a type of removal protected against by the

6    Fourteenth Amendment.  *See* Reply at 7-8.  They submit that the separation experienced by Ms.

7    Morales and K.B. between July 30 and August 4 was not a "removal," because the County did not

8    gain custody pursuant to California Welfare and Institutions Code § 300, and because Ms. Morales

9    chose the home at which K.B. stayed.  But Defendants have not shown that rights under the

10    Fourteenth Amendment are not implicated when a child is removed without a warrant or sufficient

11    cause simply because the separation lasted only 5 days.  The Fourteenth Amendment protects the

12    "right to live together without government interference."  *Wallis*, 202 F.3d at 1136.  The Safety

13    Plan disrupted Ms. Morales' and K.B.'s ability to live together.  Absent some de minimis rule

14    articulated by the courts, this Court concludes the Safety Plan falls within the ambit of the

15    Fourteenth Amendment.

16        b.     Voluntary Placement Agreement Removal

17        Dale also did not have reasonable cause for her continued removal of K.B. under the

18    Voluntary Placement Agreement.  She appears not to have gathered additional information

19    between the July 30 Safety Plan and the August 4 Voluntary Placement Agreement.  *See* Hearing

20    Tr. at 20:18-21 (Defendants conceding that there were no new revelations between enactment of

21    Safety Plan and enactment of Voluntary Placement Agreement).  As with the Safety Plan,

22    Defendants rely on the warrant, interview with K.B., and the 2014 investigation to establish

23    reasonable cause, and nothing more.  *See* Docket No. 76 ("Mot."), at 9-12.  They fail for the same

24    reasons discussed above.

25        c.     Conclusion

26        Construing the facts in the light most favorable to non-movants, Dale lacked reasonable

27    cause to believe that K.B. was in imminent danger of serious bodily injury such that his

28    immediate, warrantless removal was necessary when the Safety Plan and the Voluntary Placement

Agreement were implemented.  Therefore, any removal must rest on Ms. Morales' consent to be valid.

2.        Consent to Removal

Defendants contend that even if there was no reasonable cause to remove K.B., Ms. Morales consented to the removal.  Plaintiffs argue that Ms. Morales' consent to the Safety Plan and Voluntary Placement Agreement was coerced by Dale and therefore was not effective.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973) ("[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force.").  For the consent analysis, the parties rely on *Sangraal v. City & County of San Francisco*, No. C-11-04884 LB, 2013 WL 3187384, at *7-*15 (N.D. Cal. 2013), *aff'd sub nom.*, *Jones v. City & County of San Francisco*, 621 F. App'x 437 (9th Cir. 2015).  In that case, a newborn's father Sangraal and mother Jones sued social workers and the City and County of San Francisco.  The suit was based in part on a Safety Plan signed by Jones and Sangraal.  The plan required Jones and the newborn to stay at the hospital for two days after the baby's birth.  A social worker had threatened to remove the baby from Jones' and Sangraal's custody if they did not agree to the Safety Plan.  *Id.* at *9.  *Sangraal* analyzed whether this threat constituted coercion tainting the parents' consent to the Safety Plan.

The court noted that the Ninth Circuit has not addressed the issue and therefore looked to other circuits.  *Sangraal* first concluded that safety plans are not "*inherently* coercive when agencies force parents to sign the plan or face the threat of formal removal proceedings," because the plan is still voluntary, that is, "the decision to agree to a safety plan is optional with the parents."  *Id.* (emphasis added) (quoting *Dupuy v. Samuels*, 465 F.3d 757, 759-63 (7th Cir. 2006) (analogizing safety plans to settlement agreements and noting that "[i]t is not a forbidden means of 'coercing' a settlement to threaten merely to enforce one's legal rights")).  However, a threat of removal is nonetheless coercive where the social worker "lacked objectively reasonable grounds to believe" that the child had been abused or was in imminent danger of abuse.  *Sangraal*, 2013 WL 3187384, at *10 (citing *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1127 (3rd Cir. 1997)).  *Sangraal* applied this analysis to its own case, reasoning that if the *Sangraal*

9

social worker had reasonable cause to believe the child was in imminent danger of serious bodily harm, then the social worker would be entitled to remove the child under *Wallis*. This then entitled the social worker to threaten removal in order to achieve "consent" to the Safety Plan. In other words, under *Sangraal*, consent is coerced where the social worker threatens removal but lacks the authority to carry out that threat under *Wallis*. But if the social worker has such authority, the consent is not coerced.

This Court agrees with *Sangraal* that a social worker's threat to do something that she is not entitled to do is a factor in favor of finding coercion. But such a threat is not conclusive on the question of voluntariness. To so hold would make voluntariness turn exclusively on the merits of the authority to take the challenged action, effectively conflating the analysis and rendering consent/voluntariness immaterial. To the contrary, it is possible to have uncoerced consent to, *e.g.*, a search, even if that search was not supported by probable cause and a warrant; the voluntariness of consent does not necessarily turn on whether there was sufficient cause for the search. Instead, "[w]hether consent to search was voluntarily given is 'to be determined from the totality of all the circumstances.'" *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 222). Although certain factors may "aid in the decisionmaking process, the full richness of any encounter must be considered by the district court." *United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995), *abrogated on other grounds by Georgia v. Randolph*, 547 U.S. 103 (2006). Those factors may include the words and actions of the officer, the sophistication or vulnerability of the person searched, etc.

        a.    Consent to the Safety Plan

In this case, Ms. Morales, Dale, and Denton discussed the Safety Plan on July 30 for approximately 30 minutes. During this discussion, which took place in the Morales home, Dale said, "What I'm trying to avoid is having to take him out of here and put him in foster care while we work this out. If we can do a safety plan where he can stay somewhere else during . . . ." Removal Tr. at 2. This is the purported threat. Because this statement can appear to be a threat to immediately remove K.B. and because, per the above analysis, Dale did not have the authority to do so under *Wallis*, this statement is one factor in favor of finding coercion.

United States District Court
For the Northern District of California

1    But this factor is heavily outweighed by the other undisputed facts. Importantly, Ms.

2  Morales was clearly not intimidated by Dale. The audio recording of the encounter makes clear

3  that Ms. Morales' tone was self-assured and sometimes even aggressive. *See* Docket No. 77-3,

4  Ex. J ("Removal Recording"). Through the encounter, Ms. Morales was steadfast in her demands

5  that Dale justify her removal of K.B. She repeatedly and confidently stated, "I want section

6  numbers," "I want to know what that section says," and "I want a section number of what you're

7  removing this kid out of this house for." Removal Tr. at 3. Dale and Denton both remained polite

8  and subdued, even when Dale purportedly threatened to remove K.B. if Ms. Morales did not agree

9  to the Safety Plan. *See* Removal Recording. Several minutes into the discussion, Denton

10  interjected, "If this would be . . . I mean [inaudible 00:04:48]. He could stay at my house for the

11  weekend." Removal Tr. at 4 (alteration in original). Ms. Morales replied in a bright and agreeable

12  tone, "Oh, that sounds great. He can go to see Jason [Denton's son]. . . . He can go with CJ

13  [Denton] because I trust these people. They're nice people and he can go there." *See* Removal

14  Recording; Removal Tr. at 4. After a few minutes of additional back and forth regarding why

15  Dale was preventing Ms. Morales from seeing K.B., Ms. Morales confirmed her agreement,

16  saying, "He can go with CJ." Removal Tr. at 7. She did not retract her consent or otherwise

17  undermine it after this confirmation. Additionally, though the mere presence of an officer may

18  sometimes be coercive, Ms. Morales was quite comfortable with Denton. *See id.* at 5 (Ms.

19  Morales describing Denton as trustworthy and "nice" and casually referring to him as "CJ").

20  Further, Ms. Morales had prior experience with Dale and knew Denton.

21    That Ms. Morales was not intimidated is exemplified when Dale asked Ms. Morales to step

22  out of the house. Dale wanted K.B. to enter the home and pack clothes for the stay with Denton

23  without seeing Ms. Morales. Ms. Morales stood her ground and declared, "No I'm not. This is

24  my house. . . . I'm not going to." *Id.* at 7. Dale relented and did not force the point. Indeed,

25  Plaintiffs themselves argue that Ms. Morales was not intimidated. *See* Docket No. 95, at 11

26  (Plaintiffs arguing that Ms. Morales, while "intimidated" in the sense that she was not prepared to

27  physically attack Dale to prevent K.B.'s removal, was not a "wilting lily," as exemplified by Ms.

28  Morales persistently questioning Dale's authority).

11

1      Finally, Ms. Morales was not an unsophisticated and vulnerable subject. She had worked

2 at Child Protective Services and appears to be familiar with its employees. *See* Removal Tr. at 3

3 ("I worked down there. I know what you have to do and what you don't have to do, and you have

4 to give me a section number right now."), 12, 13 ("I did once work where you [Dale] worked.").

5 The encounter ends with Ms. Morales having an amicable conversation with Denton and thanking

6 him several times. *See id.* at 16-19 ("Thank you so much. Thank you. Both of you [referring to

7 Denton and Denton's wife who came to pick up K.B.] I really appreciate it.").

8      Given these circumstances, no reasonable jury could find that Ms. Morales did not

9 voluntarily consent to K.B.'s removal from her home. Furthermore, even if Ms. Morales's

10 consent was in fact involuntary, a reasonable officer could have believed otherwise given the facts

11 discussed above. Because it would not have been clear to "every" agent that Ms. Morales' consent

12 was involuntary, Dale is entitled to qualified immunity.[2] *See Fry*, 873 F.3d at 821. The Court

13 **GRANTS** summary judgment to Defendants as to Claims 1, 2, and 3 insofar as they rest on K.B.'s

14 removal under the Safety Plan.

15      b.   Consent to the Voluntary Placement Agreement

16      As for Ms. Morales' meeting with Dale regarding the Voluntary Placement Agreement on

17 August 4, there is little evidence on what was actually said when Ms. Morales agreed to the longer

18 displacement of K.B. No transcript or audio recording has been provided to the Court. However,

19 Ms. Morales states that "[Dale] told us that if I did not sign [the Voluntary Placement Agreement],

20 KB would be taken away from me and Rudolfo and we would not be able to see him again."

21 Morales Decl. ¶ 7. Defendants argue that Ms. Morales was merely informed that Defendants

22 would petition the juvenile court if Ms. Morales refused to enter into the Voluntary Placement

23 Agreement. *See* Reply at 5. Exactly what was said and whether it was said in a coercive manner

24 or setting appears to be a genuine dispute of material fact. Unlike the situation with the Safety

25

26 ---

[2] Plaintiffs argued at the hearing that consent is a factual question not properly considered in a qualified-immunity analysis. But qualified immunity is often resolved at summary judgment

27 where it is clear that, based on undisputed facts or taking all facts in the non-movant's favor, the defendant is entitled to qualified immunity. *See, e.g., Liberal v. Estrada*, 632 F.3d 1064, 1082

28 (9th Cir. 2011) (deciding, in summary judgment context, whether defendants were entitled to qualified immunity on the issue of consent).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Plan discussion, there are no clear indications of voluntary consent. The issue of consent cannot be determined on this spare record, particularly since Defendants bear the burden of proving consent. *See Cervantes*, 703 F.3d at 1141.

Nor can qualified immunity be adjudicated absent facts showing whether every reasonable official in Dale's place would have known that Ms. Morales' consent was coerced.

Defendants' request for summary judgment is therefore **DENIED** with respect to Claims 1, 2, and 3 insofar as they rest on K.B.'s continued separation from Ms. Morales under the Voluntary Placement Agreement.

C.    Medical Intervention (Claim 6)

Defendants move for summary judgment of Claim 6. Claim 6 alleges that Dale and various Doe defendants violated Ms. Morales and K.B.'s right to familial association by subjecting K.B. to a mental health evaluation and giving him unspecified prescription medication without notifying Ms. Morales or obtaining her consent.

The right to family association extends to the right of parents to make "important" medical decisions for their children. *Wallis*, 202 F.3d at 1141. Likewise, children have the right to have such decisions made by their parents. *See id.* This right requires the government to obtain either parental consent or judicial authorization with parental notification before conducting "physical examinations" on the minor for "investigative purposes." *Id.* The right also encompasses a "family's right to be together" when children are "receiving medical attention" or "medical procedures, including examinations," "particularly those . . . that are invasive or upsetting." *Id.* at 1142. "The interest in family association is particularly compelling at such times, in part because of the possibility that a need to make medical decisions will arise, and in part because of the family's right to be together during such difficult and often traumatic events." *Id. Wallis* explained these rights in the context of minors who had been seized by police officers and subjected to anal and vaginal medical examinations without judicial authorization or parental consent. *See id.* at 1131.

The Ninth Circuit again addressed the familial right to be together during medical procedures in *Greene v. Camreta*, 588 F.3d 1011 (9th Cir. 2009), *vacated in part on other grounds*

13

*Greene v. Camreta*, 661 F.3d 1201 (9th Cir. 2011).  There, a mother had been ordered to leave the facility where her children were subject to an exam that included photography of the genitalia. This violated the mother and children's rights to be together or at least be nearby during potentially traumatic medical examinations.  *See id.* at 1037.  Their rights were "at their apex" because of the potential trauma that could come of an invasive procedure like having one's genitalia photographed.  *See id.*

Here, Plaintiffs submit testimony that K.B. was taken to the doctor twice without Ms. Morales' consent.  *See* Morales Dep. at 78.  On these occasions, he was seen by his usual physician.  *See* Powell Decl., Ex. D ("K.B. Dep."), at 46.  The nature of the visits is unclear. When K.B. was asked, "And . . . what was the nature of those [visits]?" he answered, "Uh, I'm really not quite sure."  *Id.*  Likewise, Ms. Morales states that K.B. was taken to the doctor "for I don't even know what."  *See* Morales Dep. at 78.  At some point, K.B. was also given a tuberculosis test without Ms. Morales' consent.  *See id.*

Under *Wallis* and *Greene*, a family's right to be together during a medical procedure is tuned in part to the degree of potential trauma and invasiveness occasioned by the procedure.  *See Greene*, 588 F.3d at 1037 (holding that family's right to be together was violated, where that right was at its "apex" due to potential trauma of procedure); *Wallis*, 202 F.3d at 1142 (holding that family's right to be together is "particularly compelling" for "invasive or upsetting" procedures). Plaintiff has the burden of proving a constitutional right was violated.  *See Jordan v. Herrera*, 224 F. App'x 658, 657 (9th Cir. 2007) ("In the Ninth Circuit, the burden of proof in § 1983 cases remains always with the plaintiff.").  Here, even when viewing the evidence in the light most favorable to Plaintiffs, there is no indication that K.B.'s visits were for investigatory rather than medical purposes.  Nor is there any indication that the doctor's visits carried the potential for trauma, was invasive, or involved significant medical decision-making.  Plaintiffs have not carried their burden of establishing doctor's visits violated their rights under *Wallis* and *Greene*.

Plaintiffs cite three cases in addition to *Wallis*: *Swartwood v. County of San Diego*, 84 F. Supp. 3d 1093 (S.D. Cal. 2014), *Parkes v. County of San Diego*, 345 F. Supp. 2d 1071 (S.D. Cal. 2004), and *Reynolds v. County of San Diego*, 224 F. Supp. 3d 1034 (S.D. Cal. 2016).  All three

14

United States District Court
For the Northern District of California

cases addressed the right of families to be together during medical procedures, but all three are factually distinct from this case in important ways. Like *Wallis* and *Greene*, *Swartwood* and *Parkes* involved examination of children's genitalia outside of the presence of their parents, an invasive and potentially traumatic experience. *See Swartwood*, 84 F. Supp. 3d at 1097; *Parkes*, 345 F. Supp. 2d at 1094. *Reynolds*, as well as *Swartwood*, concerned examinations for investigatory purposes, implicating heightened protections under *Wallis*. *See Reynolds*, 224 F. Supp. 3d at 1064; *Swartwood*, 84 F. Supp. 3d at 1118. None of these cases find the more pedestrian context of this case violative of the Constitution.

Given the ambiguity of the precise reach of *Wallis* and *Greene*, even if the right to family association extends to the facts in the instant case, Plaintiffs have failed to show that the law clearly establishes that these events violated their rights. As the Supreme Court admonished recently, "'clearly established law' should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552 (quoting *Ashcroft*, 563 U.S. at 742). "[T]he clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The law must be so clearly established that "'every reasonable official' would have understood that what he is doing violates that right." *Fry*, 873 F.3d at 821 (quoting *Ashcroft*, 563 U.S. at 741). Plaintiffs make no attempt to show that "'cases of controlling authority in [the plaintiff's] jurisdiction at the time' or 'a consensus of cases of persuasive authority'" placed the question of Dale's particular violation of Ms. Morales and K.B.'s rights "beyond debate." *Fry*, 873 F.3d at 823 (emphasis omitted) (quoting *Ashcroft*, 563 U.S. at 741).

Because Plaintiffs have not shown that the law clearly establishes that K.B. and Ms. Morales' rights were violated when K.B. was taken to the doctor, the Court **GRANTS** Defendants' request for summary judgment as to Claim 6.

D.   Unlawful Entry (Claim 2)

Defendants move for summary judgment of Claim 2. As previously discussed, Claim 2 includes an unlawful-seizure component based on Dale's seizure of K.B. and an unlawful-entry component based on Dale's entrance into Ms. Morales' home "without consent, a warrant or court order authorizing entry." Compl. ¶ 162. Because the see-and-speak warrant undisputedly

United States District Court
For the Northern District of California

permitted Dale to "enter the premises," Warrant Materials at KB_JV_0010, the constitutionality of Dale's entrance into Ms. Morales' home rises and falls with the validity of the warrant.  Though Plaintiffs challenge the validity of the warrant, such arguments are unavailing.

Plaintiffs argue that the warrant is invalid for three reasons that boil down to judicial deception: (1) Dale purportedly lied on her warrant application by falsely indicating that she had reviewed K.B.'s case history, (2) Dale failed to disclose the results of the 2014 investigation, *i.e.*, that K.B. had denied being abused by Ms. Morales after a teacher had overheard K.B. describing such abuse, and (3) Dale has omitted "numerous" facts.  Opp. at 16.

For a Fourth Amendment claim based on judicial deception to survive Defendants' motion for summary judgment, Plaintiffs "must 1) make a substantial showing of deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred." *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997); *see also Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011).

The first purported falsehood/omission stems from the fact that the warrant application checks a box for "CWS/CMS History reviewed."  Warrant Materials, at KB_JV_0004.  CWS/CMS stands for "Child Welfare Services/Case Management System" and is a system for tracking child welfare cases.  Plaintiffs claim that, despite the checked box, Dale never reviewed K.B.'s CWS/CMS history.  Opp. at 10 (citing Dale Dep. at 61:25-62:15).  To support their argument, Plaintiffs cite Dale's deposition.  At her deposition, Dale indicated that she had not reviewed the CWS/CMS history.  *See* Dale Dep. at 61:21-63:9.  She then corrected herself and indicated that she did review the case history.  *See id.* at 63:10-64:4.  She testifies that she looked through the history for "the gist of it; who were they; is there anything pertaining to this situation," but that she did not look at the details "because it wasn't pertinent for me to look at that information."  *Id.* at 64:5-12.

The second purported falsehood/omission is Dale's lack of specificity in her summary of the 2014 investigation.  The warrant application indicates that KB "did not disclose current physical discipline and stated he was not afraid of his grandparents."  Warrant Materials, at KB_JV_0004.  Plaintiffs claim that K.B. *did* disclose his current physical discipline by stating that

16

United States District Court
For the Northern District of California

he had not been struck on the bottom so hard that he could not sit down, as alleged in the 2014 referral.  Opp. at 11; *see* K.B. Dep. at 15:13-23.

The third purported falsehood/omission in the warrant application also concerns the 2014 investigation.  The warrant application indicates that when Ms. Morales was interviewed as part of the 2014 investigation, she had "stated that she had spanked him with a belt in the past and did threaten to spank him with a belt if his behaviors in school didn't improve."  Warrant Materials, at KB_JV_0004.  Ms. Morales denies that she made such a statement.  Opp. at 11 (citing Morales Dep. at 51:0-52:3).

The first prong of *Liston* is met.  *See* Opp. at 16-17.  This prong requires only a "substantial showing" of a deliberate or reckless disregard for the truth; "clear proof" is not required at the summary judgment stage.  *Chism*, 661 F.3d at 387.  Two factors relevant to this determination are (1) whether the false statements and omissions "*bolster* the case for probable cause" and (2) the extent to which the affiant knew of the falsity or of the omitted fact.  *Id.* at 388.  These factors would permit a reasonable factfinder to conclude that the affiant intended to manipulate the magistrate.  *Id.*

The second and third false statements/omissions above bolster the case for probable cause, because they suggest that Ms. Morales had abused K.B. in 2014, increasing the likelihood that she had abused him in 2015.  The first false statement also conceivably bolsters the case for probable cause, because it suggests that Dale had conducted research on K.B.'s history with CPS and found nothing to suggest that the 2015 complaint was misleading or incorrect.  Taking Plaintiffs' factual submissions as true and drawing all reasonable inferences in Plaintiffs' favor, the Plaintiffs have raised a genuine issue of fact as to whether Dale knew of the falsities and omissions.  This is sufficient to make a "substantial showing" that Dale acted with deliberate or reckless disregard for the truth.

The second prong of *Liston* is not met, however.  This prong requires that the false statement or omission be material.  False statements and omissions are material "if 'the affidavit, once corrected and supplemented,' would not have provided a magistrate judge with a substantial basis for finding probable cause."  *Chism*, 661 F.3d at 388-89 (quoting *United States v. Stanert*,

United States District Court
For the Northern District of California

762 F.2d 775, 782 (9th Cir. 1985)). Plaintiffs fail to show that the falsehoods and omissions were but-for causes of the warrant's issuance. They only "posit" that "the warrant would have been denied." Opp. at 17. Moreover, even if the warrant application were corrected, the substantial narrative regarding the 2015 referral would have been sufficient basis for the warrant to issue. For example, the narrative states that the referral "reported that, '[K.B.] is hit if he does anything his grandmother does not think is right. He is hit on his face, chest and butt—whipped with a belt, gets called fat and his food intake is very limited. She hits him in the face with an open hand and sometimes fist . . . .'" Warrant Materials, at KB_JV_0004. Even if Dale had not checked the CWS/CMS history box, had stated that K.B. denied abuse during the 2014 investigation, and had not stated that Ms. Morales admitted to spanked K.B. with a belt during the 2014 investigation, there would still have been substantial grounds based on the 2015 referral for the warrant to issue and to begin the investigation. The warrant is therefore valid.

Plaintiffs also argue that the warrant only permitted Dale to enter the Morales residence once. *See* Opp. at 4-5. She first entered the home to greet Ms. Morales and arrange to speak with K.B. outside the home. Plaintiffs argue that Dale's entrance into the residence after interviewing K.B. constituted an unlawful entry. Though Plaintiffs do not explain further, this argument might be premised on the notion that the warrant only permitted Dale to see and speak with K.B., which was accomplished after the interview. But the warrant clearly permits Dale also "to inspect the safety of the home, to determine whether child welfare services should be offered to the family, and to determine whether juvenile court proceedings should be commenced." Warrant Materials at KB_JV_0008. Re-entering the residence to follow up with Ms. Morales after speaking to K.B. is within the scope of this mandate.

In any case, a reasonable official could have believed that Dale was acting lawfully under the warrant in entering the house the second time, and qualified immunity therefore applies.

Because the warrant is valid and because qualified immunity applies, the Court **GRANTS** summary judgment to Defendants with respect to the unlawful-entry component of Claim 2.

E.      Unbriefed Claims

Defendants request summary judgment for Claims 4 and 5 but provide no briefing at all.

United States District Court
For the Northern District of California

1  Plaintiffs pointed out Defendants' failure to make arguments regarding these claims, *see* Opp. at 4,

2  5, but Defendants nonetheless fail to address these claims in their Reply.  The Court therefore

3  **DENIES** summary judgment as to Claims 4 and 5.

4  F.    *Monell* Liability

5     Defendants request summary judgment as to all § 1983 claims against the County brought

6  under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  *Monell* permits

7  municipalities to be held liable for the § 1983 violations of their employees.  *Monell* liability

8  requires that a municipal "policy or custom" led to the plaintiff's injury and that such policy or

9  custom "reflects deliberate indifference to the constitutional rights of [the municipality's]

10 inhabitants."  *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (quoting *City of*

11 *Canton v. Harris*, 489 U.S. 378, 392 (1989)).

12    Plaintiffs present evidence that amounts to the County's failure to train as follows:  Dale

13 had removed children five to eight times and never obtained a removal warrant.  *See* Dale Dep. at

14 25-26.  Dale later corrected herself and says that she obtained a warrant at least once.  *See id.* at

15 46.  Furthermore, she had never heard of a social worker being disciplined for failing to obtain a

16 warrant, *see id.* at 27, nor had she received training on constitutional amendments or case law

17 relevant to removal.  *See id.* at 57-58.  She also had not received "formal training" on how to

18 obtain a child protective custody warrant, although she had received "one-on-one training."  *Id.* at

19 45-46.  Dale's understanding, based on the training, was that she could warrantlessly remove a

20 child "[i]f there is any immediate danger" that would "rise to the level of having some sort of

21 effect on the child."  *Id.* at 39.  The list of evidence that Plaintiffs present continues with similar

22 statements.  *See* Opp. at 8-9.

23    This evidence fails to establish a genuine dispute as to the existence of a policy or custom

24 that reflects the County's *deliberate indifference* to constitutional rights.  *See City of Canton, Ohio*

25 *v. Harris*, 489 U.S. 378, 389.  Plaintiffs have presented no evidence that "the need for more or

26 different training is so obvious, and the inadequacy so likely to result in the violation of

27 constitutional rights, that the policymakers of the city can reasonably be said to have been

28 deliberately indifferent to the need."  *Id.* at 390.  Plaintiffs offer no evidence, for instance, that the

1  prior warrantless removals of children by Dale were done without consent or sufficient cause.

2  Plaintiffs offered no evidence of a known pattern of constitutional violations.  Nor is there any

3  evidence that the one-on-one training was inadequate or insufficient to prevent repeated

4  constitutional violations.  The Court therefore **GRANTS** summary judgment as to the County's

5  *Monell* liability.

## V.   CONSPIRACY FOR IIED (CLAIM 8)

7  Defendants move for summary judgment on Claim 8, a state-law claim for conspiracy to

8  intentionally inflict emotional distress ("IIED").  Claim 8 alleges that Wright, in addition to now-

9  dismissed defendants Buxton, Sookne, and V.W., conspired to cause K.B.'s removal from Ms.

10  Morales' custody, thereby inflicting emotional distress upon them.  Compl. ¶ 199.  The claim as to

11  V.W. was previously dismissed with prejudice.  *See* Docket No. 74.

12  Defendants argue that "[P]laintiffs have failed to demonstrate 'extreme and outrageous

13  conduct by the defendant with the intention of causing, or reckless disregard of the probability of

14  causing, emotional distress.'"  Mot. at 17 (quoting *Potter v. Firestone*, 6 Cal. 4th 965, 1000

15  (1995)).  However, Defendants go no further.  Defendants fail to cite the record to show

16  undisputed facts warranting summary judgment as a matter of law.  Indeed, Defendants'

17  conclusory repetition of the law does not even indicate which element of IIED Plaintiffs will be

18  unable to prove.

19  Defendants instead focus on the intracorporate conspiracy doctrine, arguing that the

20  doctrine renders legally impossible any civil conspiracy between employees of a municipality

21  acting within the scope of their employment.  Mot. at 16.  Under the intracorporate conspiracy

22  doctrine, "[a]gents and employees of a corporation cannot conspire with their corporate principal

23  or employer where they act in their official capacities."  *Applied Equip. Corp. v. Litton Saudi

24  Arabia Ltd.*, 7 Cal. 4th 503, 512 n.4 (1994) (quoting *Wise v. S. Pac. Co.*, 223 Cal. App. 2d 50, 72

25  (1963)).  Later cases suggest that this rule also bars conspiracies between employees acting in their

26  official capacities.  *See Black v. Bank of Am.*, 30 Cal. App. 4th 1, 6 (1994) (holding that

27  conspiracy requires two entities and that the acts of corporate agents are the corporation's acts).

28  Wright's actions, however, did not take place in the course of her employment.  As Defendants

20

argue elsewhere, her "involvement is that of a biological mother." Mot. at 14; *see* Compl. ¶¶ 39-40, 50-51, 55-62 (allegations of Wright's personal, non-official conduct).[3] Defendants have not shown that employees are legally incapable of conspiring with non-employees.

Defendants also argue that the state claims, brought into this suit under supplemental jurisdiction, should be dismissed because the Court should grant summary judgment to Defendants on the federal claims. Mot. at 15-16. Because the Court denies summary judgment on some federal claims, this basis for dismissal of the state claims is inapplicable.

For the above reasons, the Court **DENIES** summary judgment regarding Claim 8.

## VI.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** summary judgment as to Claims 1 and 3 for K.B.'s removal under the Safety Plan, the unlawful-seizure portion of Claim 2 for K.B.'s removal under the Safety Plan, the unlawful-entry portion of Claim 2, Claim 6, and the County's liability under *Monell* for all claims. The Court **DENIES** summary judgment for K.B.'s removal under the Voluntary Placement Agreement for Claim 1, the unlawful-seizure portion of Claim 2 pertaining to K.B.'s removal under the Voluntary Placement Agreement, and Claim 3 pertaining to the time of the Voluntary Placement Agreement. The Court also **DENIES** summary judgment as to Claims 4, 5, and 8. The Court also **GRANTS** summary judgment with respect to Plaintiffs' claim that their rights were violated by Dale's omissions and misrepresentations in obtaining the see-and-speak warrant.

This order disposes of Docket No. 76.

**IT IS SO ORDERED.**

Dated: February 5, 2018

EDWARD M. CHEN
United States District Judge

---

[3] For the same reason, immunity under Cal. Gov. Code §§ 820.2 and 821.6 is not applicable.

21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LINDA MORALES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF MENDOCINO, et al.,<br><br>Defendants. | Case No.16-cv-02429-EMC<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on 2/5/2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Nancy K. Delaney
Mitchell Brisso Delaney & Vrieze
814 Seventh Street
P.O. Drawer 1008
Eureka, CA 95502

Robert Ross Powell
Law Offices of Robert R. Powell
925 West Hedding Street
San Jose, Ca 95126

Dated: 2/5/2018

Susan Y. Soong
Clerk, United States District Court

By:_____
Betty Lee, Deputy Clerk to the
Honorable EDWARD M. CHEN

United States District Court
Northern District of California